## SARA B. GARRISON *v.* KENT E. GARRISON
### (11417)

SPEZIALE, C. J., PETERS, HEALEY, PARSKEY and GRILLO, Js.

Argued March 2—decision released May 24, 1983

*M. Hatcher Norris,* for the appellant (defendant).

*Monica L. Harper,* with whom, on the brief, was *Alan M. Kosloff,* for the appellee (plaintiff).

SPEZIALE, C. J. This is an appeal from a judgment rendered by the trial court dissolving the marriage of

the parties and from certain orders incident to that judgment. The defendant husband claims that the trial court erred: (1) in finding that there was a valid marriage; (2) in awarding a mortgage to the defendant on certain property awarded to the plaintiff payable only if the plaintiff remarried or sold the property; (3) in awarding counsel fees to the plaintiff; (4) in granting the dissolution on the ground of intolerable cruelty; and (5) in ordering, sua sponte, that the court's orders pursuant to the dissolution decree would be effective immediately and would continue in force throughout the pendency of the appeal.

## I
## MARRIAGE

The trial court found, inter alia, the following facts: The parties began to live together in 1974, without the benefit of marriage. When the plaintiff became pregnant in 1976, they decided that they would get married. The decision to marry was prompted by their parents' concern and also by the feeling of both the plaintiff and the defendant that it would be better for their child if they were married.

The parties asked their friend Sandra McLanahan, who was both a physician and an ordained minister of Paramahamsa Sannyasa of Srimat Sankaracharya, to perform a marriage ceremony for them. They took out a marriage license, had blood tests performed, and participated in a ceremony at the home of the defendant's brother in March of 1976, which many of the parties' relatives and friends attended. During the ceremony the parties exchanged flower garlands and pledged themselves to one another. Following the formal ceremony, the parties had a reception which included the traditional cutting of a wedding cake.

The court specifically found that "[t]he marriage license was signed by the plaintiff, defendant and Dr. McLanahan at the end of the ceremony." The license was then given to the defendant for him to file with the town clerk. It was never filed, and could not be produced at trial.[1]

The defendant claims that the trial court's finding of a valid marriage was clearly erroneous. He does not argue that the mere failure to file the marriage license makes the marriage void. See *Carabetta* v. *Carabetta,* 182 Conn. 344, 349, 438 A.2d 109 (1980). He does claim, however, that the failure to file the license is evidence which, when taken with other evidence offered at trial, shows that the parties never intended to be married. He asserts that the marriage was simply a sham.

If neither party had intended to be married, their lack of mutual consent would render the marriage contract void. *Davis* v. *Davis,* 119 Conn. 194, 201–203, 175 A. 574 (1934). "The making of a contract does not depend upon the secret intention of a party [however,] but upon the intention manifested by his [or her] words or acts, and on these the other party has a right to proceed." *Nutmeg State Machinery Corporation* v. *Shuford,* 129 Conn. 659, 661, 30 A.2d 911 (1943). The trial court found that the plaintiff intended at all times to enter into a marriage, and that the acts of both parties clearly indicated such an intent.

To support his claim of error, the defendant outlines testimony which could indicate that the parties did not intend a valid marriage to take place. The only relevant uncontroverted evidence he offers, however, is

---

[1] The parties placed the certificate in a safe deposit box shortly after the ceremony. The plaintiff visited the box only one time after that, in the defendant's presence. All other signatures on the safe deposit signout card were the defendant's. The defendant reported that it was missing when the plaintiff requested to see it prior to trial.

that the parties did not intend to file the marriage license. The trial court chose not to credit the defendant's other evidence, and found that the plaintiff, at least, did intend to marry.[2]

This court may reject a factual finding if it is clearly erroneous, in that as a matter of law it is " 'unsupported by the record, incorrect, or otherwise mistaken.' *Kaplan* v. *Kaplan,* [186 Conn. 387, 392, 441 A.2d 629 (1982)]"; *Schaffer* v. *Schaffer,* 187 Conn. 224, 228, 445 A.2d 589 (1982); Practice Book § 3060D. The record in this case demonstrates that there is sufficient evidence to support the trial court's finding that the parties intended to be married when the ceremony was performed, and we cannot find it to be clearly erroneous.

## II
### MORTGAGE

The trial court, pursuant to General Statutes § 46b-81,[3] assigned certain jointly owned real property to the plaintiff, and also required that on that property "[t]he plaintiff shall grant a $25,000.00 non-interest bearing mortgage to the defendant, which mortgage shall become due and payable at such time as the property is sold or the plaintiff remarries, whichever occurs first." The defendant claims that this mortgage is void because it violates the rule against perpetuities.

---

[2] In fact, the trial court also found that "the defendant did not make a credible case that he himself did not intend to be married to the plaintiff when the March 7, 1976 marriage was performed."

[3] General Statutes § 46b-81 provides in relevant part: "Sec. 46b-81. (Formerly Sec. 46-51). ASSIGNMENT OF PROPERTY AND TRANSFER OF TITLE. (a) At the time of entering a decree annulling or dissolving a marriage or for legal separation pursuant to a complaint under section 46b-45, the superior court may assign to either the husband or wife all or any part of the estate of the other. The court may pass title to real property to either party or to a third person or may order the sale of such real property, without any act by either the husband or the wife, when in the judgment of the court it is the proper mode to carry the decree into effect."

This claim is without merit. The rule against perpetuities is applicable only if an interest is not vested. Gray, The Rule Against Perpetuities (1886) § 205, p. 145; see *Wilbur* v. *Portland Trust Co.,* 121 Conn. 535, 537, 186 A. 499 (1936). In a title theory state such as Connecticut, a mortgage is a vested fee simple interest subject to complete defeasance by the timely payment of the mortgage debt. *Chappell* v. *Jardine,* 51 Conn. 64, 68-69 (1884). The trial court therefore did not err concerning the mortgage award.

## III
### COUNSEL FEES

The defendant's next claim is that the court erred by awarding $2500 in counsel fees to the plaintiff when "[t]he defendant's financial affidavit reflected that he had no liquid funds from which to pay an order of counsel fees." "Whether to award counsel fees in matters involving a dissolution of marriage is within the discretion of the trial judge. General Statutes § 46b-62." *Weiman* v. *Weiman,* 188 Conn. 232, 236, 449 A.2d 151 (1982). Section 46b-62 states, in relevant part, that "the court may order either spouse to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82." Those criteria include, inter alia, the "occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties . . . ." General Statutes §46b-82. The defendant concentrates in his argument solely on the "estate" of the parties, and protests that he does not now have "ample liquid funds with which to pay counsel fees."[4] The trial court, which was not

---

[4] The "ample liquid funds" language comes from our decision in *Koizim* v. *Koizim,* 181 Conn. 492, 501, 435 A.2d 1030 (1980), where we held that counsel fees could not be awarded to a party if "both parties are financially able to pay their own counsel fees . . . ." The focus of the inquiry

required to mention specifically each of the statutory criteria in making its award; *Scherr* v. *Scherr,* 183 Conn. 366, 368, 439 A.2d 375 (1981); found that the defendant had failed to account either for approximately $5000 in funds which he received from a post-separation refinancing of the parties' jointly owned real property or for more than $6000 in insurance proceeds from the destruction of a jointly owned trailer. The court also found that "[t]he defendant has continued with his part-time job . . . making no effort to augment his earnings, content to live off the equity of the property." It is clear that under the criteria of § 46b-82, quoted above, the trial court considered that the defendant's vocational skills, employability, and estate justified the award of counsel fees, despite the apparent lack of liquid assets in his financial affidavit. Furthermore, "[i]f the court could reasonably have concluded that the [plaintiff's] financial resources, even when supplemented by the financial orders contained in the judgment, were necessary to meet her future needs and therefore were not available to pay counsel fees, there was no abuse of discretion." *Weiman* v. *Weiman,* supra, 237. We find no abuse of discretion in the trial court's award.

## IV
### INTOLERABLE CRUELTY

We next address the defendant's claim that the trial court erred in granting the dissolution on the ground of intolerable cruelty. "[I]ntolerable cruelty has a subjective as well as an objective significance. There must not only be proof of acts of cruelty on the part of the defendant, but proof that in their cumulative effect

is not, however, on the payor-spouse as the defendant here contends, but rather on the total financial resources of the parties in light of the statutory criteria. *Venuti* v. *Venuti,* 185 Conn. 156, 161, 440 A.2d 878 (1981).

upon the plaintiff they are intolerable in the sense of rendering the continuance of the marital relation unbearable by him [or her]." *VanGuilder* v. *VanGuilder,* 100 Conn. 1, 3, 122 A. 719 (1923); *Gowdy* v. *Gowdy,* 120 Conn. 508, 510, 181 A. 462 (1935); see *Taylor* v. *Taylor,* 154 Conn. 340, 342–43, 225 A.2d 196 (1966).

The trial court found that beginning in early 1979 the defendant's "attitude toward both the plaintiff and his children was increasingly one of impatience and indifference. . . . On two separate occasions during the summer and fall of 1979 plaintiff became ill. She contracted several breast infections after Christopher's birth. She had to call on her mother for help because during these periods the defendant would not take care of the family even though his only work consisted of . . . several hours per month . . . . On two different occasions during this same period the defendant struck the plaintiff in the presence of the children." During the month of February, 1980, the defendant openly admitted to having a sexual relationship with a neighbor. In March of 1980 "the defendant ordered the plaintiff to leave the family home and threatened physical harm if she returned." These facts are supported by the testimony of the plaintiff, and are not seriously challenged by the defendant. The fact that the testimony is uncorroborated does not make it insufficient to support a finding of fact if the testimony is believed by the trier. *Jarrett* v. *Jarrett,* 151 Conn. 180, 182, 195 A.2d 430 (1963); see *Dombrowski* v. *Dombrowski,* 169 Conn. 85, 86, 362 A.2d 907 (1975). The trial court found that the marriage should be dissolved on the basis of the defendant's intolerable cruelty.

The defendant contends that the facts found do not demonstrate a "continued and persistent course of con-

duct or a series of acts or circumstances occurring while the parties are still living together"; *McCarthy* v. *McCarthy*, 123 Conn. 409, 412, 195 A. 607 (1937); as required for a finding of intolerable cruelty. He claims that his conduct consisted only of isolated acts spread over a period of time.

Whether there exists a "continued and persistent course of conduct" is not determined by a particular time span, but rather by the behavior of the parties.[5] The court found that, over a period of slightly more than a year, the defendant was impatient and indifferent toward the plaintiff when she was ill, that he struck her on two different occasions, and that he evicted her from her home on threat of physical injury. No evidence was offered that the plaintiff directed any violence toward the defendant. Where the trial court finds that physical abuse by only one party has been repeated, it is reasonable for the court to conclude that a continuing course of conduct is established.

The trial court's finding that the behavior of the defendant constituted a continuing course of conduct is clearly supported by the record. In cases like the one before us, it would be archaic and absurd to hold that the plaintiff was under an obligation to be beaten more often in order to establish a continuing course of conduct. The facts found indicate that the defendant's attitude toward the plaintiff had become indifferent and uncaring for months before the striking incidents. He was at times openly hostile and cruel, as when he con-

---

[5] In *Jacobs* v. *Jacobs*, 95 Conn. 57, 63, 110 A. 455 (1920), the course of conduct spanned less than eleven months. More modern cases have held that in some circumstances very little time is necessary to establish a course of conduct. "Even one beating constitutes more than a single act of violence when it is composed of repeated and prolonged acts of physical abuse." *Echevarria* v. *Echevarria*, 40 N.Y.2d 262, 264, 353 N.E.2d 565, 386 N.Y.S.2d 653 (1979).

fronted the plaintiff with his own adultery.[6] He had struck her twice, for no apparent reason. In this atmosphere, a person in the plaintiff's position could reasonably believe that the physical abuse would either continue or escalate. It would thereafter be reasonable to consider that the continuation of the marital relationship would be unbearable. The trial court did not err, but reasonably concluded that the defendant's actions constituted intolerable cruelty.

## V
### ALIMONY AND PROPERTY DIVISION

The defendant's claims of error concerning alimony and the division of property rest solely upon his assertion that no valid marriage existed. We have earlier affirmed the trial court's conclusion to the contrary, and therefore need not address this claim further.

## VI
### SUA SPONTE POSTJUDGMENT ORDERS

The defendant's final claim of error concerns post-judgment orders entered sua sponte by the trial court in its memorandum of decision announcing the judgment. The court, citing *Yontef* v. *Yontef*, 185 Conn. 275, 288, 440 A.2d 899 (1981), stated that "th[e] court's orders as contained herein shall remain in effect as post-judgment orders from the date of this judgment through the twenty-day period subsequent to the date of this judgment and through any appeal of the court's judgment which is taken by the defendant." The defendant asserts that the trial court abused its discre-

---

[6] "Cruel and inhuman treatment may be shown by an actual physical lack of safety, danger, and indignity to the wife or husband . . . and it may be accomplished in 'subtle and insidious' ways through continuous mistreatment and indignity of a much more refined character. *Newberry* v. *Newberry*, 493 S.W.2d 99, 101 ( [Tenn. App.] 1973)." *Harwell* v. *Harwell*, 612 S.W.2d 182, 184 (Tenn. App. 1980).

tion because the order exceeded the scope of post-judgment orders permitted in *Yontef* v. *Yontef,* supra. We agree.

In *Yontef* v. *Yontef,* supra, 293–94, we stated: "In the interest of minimizing the emotional trauma so often imposed upon the children of divorce, a trial court should, at or before the time of its judgment, inquire whether its custody order is apt to be acceptable to the parties or is apt to be further litigated upon appeal. If an appeal appears likely, the court should enter whatever interim postjudgment order it deems most appropriate, in the exercise of its broad discretion, taking into consideration the needs of the minor children for continuity, stability and well-being as well as the need of the parent who appeals for a fair opportunity fully to present his or her case. These legitimate needs are not, in all probability, apt to be protected if dissatisfied parties are able to intervene unilaterally, without judicial supervision, to effect changes in custody pending appeal. A court exercising its equitable jurisdiction with regard to custody has the duty to assure itself that its judgment will be implemented equitably to serve the best interests of the children for the near as well as for the more distant future." Our concern in *Yontef* was "to ensure an orderly transition [from prejudgment status to postjudgment status] that protects the primary interests of the children in a continuous, stable custodial placement" during the period in which the enforcement of the judgment is stayed. *Yontef* v. *Yontef,* supra, 291–92; Practice Book § 3065.

The *Yontef* decision was not intended, however, to permit the trial court to issue orders effectively negating the stay provisions of § 3065. The orders sanctioned in *Yontef* are intended solely to stabilize the custody situation by ensuring that a judicial custody order will be in effect during the pendency of any appeal

taken. This precludes the parents from giving in to "the temptation for disruptive self–help" to effectuate a change in custody. *Yontef* v. *Yontef,* supra, 292. A trial court, however, should not make sua sponte post-judgment orders on issues other than custody. If the prevailing party wants to have other portions of the judgment become immediately effective, he or she may make a motion to terminate the stay pursuant to Practice Book § 3065, and obtain a prompt resolution of the question. A sua sponte order terminating the stay, however, would permit the trial court to prejudge the merits of termination, and deprive the losing party of an opportunity for a full hearing.

In areas other than custody, there is no compelling policy reason to justify unilateral trial court action of the kind recommended in *Yontef.* It was, therefore, error for the trial court to make such postjudgment orders affecting the rights of the parties other than the custody of the children. We nevertheless reject the defendant's suggestion that we reverse the judgment, because this court previously corrected this claimed error when we granted the defendant's motion to stay these orders.[7]

---

[7] Following the announcement of the orders in this case the defendant quite properly brought a motion to this court pursuant to Practice Book § 3068 for a stay of execution pending decision in this court on the defendant's appeal of those orders. We granted the defendant's motion for a stay on June 16, 1982. The plaintiff thereafter properly brought a motion in the trial court under § 3065 to terminate that stay, which motion was granted by the trial court on August 11, 1982. The defendant, pursuant to § 3107, thereafter brought a motion for review of the court's § 3065 order in this court. We granted the motion for review, but denied the relief requested, and the termination of the stay has continued in effect to the present.

Both this opinion and *Yontef* v. *Yontef,* 185 Conn. 275, 440 A.2d 899 (1981) concern only postjudgment orders issued sua sponte by the trial court. The rights of a party to move for termination of a stay pursuant to § 3065, and the established criteria for a trial court's determination of such a motion, are unaffected by either opinion.

There is no error.

In this opinion PETERS, HEALEY and GRILLO, Js., concurred. PARSKEY, J., concurred in the result.