[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The following findings and conclusions are made after hearing the testimony of the parties and other witnesses, together with a consideration of the exhibits introduced and the factors or criteria of the pertinent Connecticut General Statutes.
1. The parties were married in New Haven, Connecticut, on February 19, 1972.
2. The plaintiff (PLTF) has resided continuously within the State for more than one year prior to the filing of the complaint CT Page 9486 in this action.
3. There are three minor children of this marriage, whose names and dates of birth area as follows:
 Michael Mason, January 19, 1977; Marques Mason, October 13, 1978; La-Ria Mason, September 14, 1981.
4. A fourth child, Richard Mason, Jr., was born on July 2, 1973, and is, therefore, eighteen years of age at this time and an adult.
5. Neither of the parents nor the children have ever received any public assistance and are not receiving such at this time.
6. The marriage has broken down irretrievably. Additional findings will be set forth relative to the causes thereof.
7. Defendant (DEFT) filed a substitute answer and cross-complaint. In her substitute answer, the DEFT denies the PLTF's allegation that the marriage has broken down irretrievably. In her cross-complaint, the DEFT alleges that the PLTF ". . .between January 1990 and the date of this Cross Complaint has been guilty of intolerable cruelty to the defendant wife."
8. In his complaint the PLTF seeks custody of the minor children. In her cross-complaint the DEFT seeks custody and support for only the minor, La-Ria. She testified at the hearing that she was seeking joint legal custody of the three minor children but would want physical custody and support only for La-Ria, the daughter whose needs she felt more qualified to meet. She conceded that the two teenage boys, Michael and Marques, could be better led into their respective manhoods by the father, under his physical custody. On September 19, 1990, the file reveals a written agreement, signed by the parties, in which they then agreed to share joint custody over the four minors. During the course of this hearing the PLTF testified to being agreeable to joint legal custody of the now three minors, but requested for himself sole physical custody of the three minors and to have the final word in any dispute with the DEFT over any major questions related to the children.
9. The DEFT seeks alimony for herself and suppport for La-Ria and does not wish to pay support for the two boys to the PLTF. The PLTF does not seek alimony and support, if he has physical custody of the three children and is not ordered to pay alimony. If alimony is awarded to the DEFT, then the PLTF seeks a support order against the DEFT. CT Page 9487
INTOLERABLE CRUELTY
The DEFT testified that the PLTF was cruel to her in several ways. Primarily she referred to two diaries kept by the PLTF for the years 1988 and 1990 in which he had made entries critical of her with respect to certain actions. She submitted into evidence exhibit 25, a diary kept by the PLTF for the year 1988. She was unable to produce the diary for 1990 to also introduce, but did testify to some of its contents as best she could recall. The DEFT stated in her brief on page 2, "The Husband was Intolerably Cruel By Keeping A Diary of His Marital Problems." The DEFT cites the case of Zoarski v. Zoarski, 161 Conn. 578 (1971), and more particularly refers to the memorandum of the trial judge in the case. It is true that Judge Bordon stated that, in his opinion, the acts of the plaintiff-husband of keeping a chronicle of the daily doings of the wife were in themselves acts of cruelty; that it was not natural or normal to keep such a diary to use it to establish grounds for a divorce on cruelty. He found the diaries were kept in preparation for the divorce action.
The case at bar is immediately and readily distinguishable. The PLTF did not introduce the diary into evidence. He did not use the diary to establish grounds for a dissolution. The diary was introduced into evidence by the DEFT in her case in chief and not during the presentation of the PLTF's case. The DEFT testified that she first saw the entries in the diaries in 1990.
There are two findings that I make. First, there is no credible evidence that the PLTF made any such entries for the purpose of establishing proof of grounds for a dissolution. I will expand briefly later. The second finding is that there is no indication that the diary or diaries and the contents thereof had any adverse or cruel impact on the DEFT. One must also consider that the Supreme Court memorandum of decision in Zoarski was extremely brief with no mention of the diaries kept by the PLTF.
Finally, I have examined the only diary submitted. The 1988 diary contains but a few pages in which notations appear referring to the DEFT. It is not necessary to repeat word for word the references set forth. In the early part of the year 1988 there are very brief references to the PLTF's religious work as well as his work making improvements to the family residence, together with the DEFT's help, and finally that after both working around the house on a Saturday in May, they "took the kids to the park for some baseball." The first critical entry is Friday, July 15. The entry notes that the DEFT has again received a hair cut. The PLTF reflects that she may be doing this to bother him. He notes also that she loves to tell people that he does not want her to cut her hair but she proceeds to show such people that she has cut it. He notes in his book that he would never again comment on her CT Page 9488 hair length so that he will not look "Bad" when she would report to the people.
On July 18, there is a reference to the DEFT telling the PLTF that she had ordered colored contact lenses for her eyes. Again his specific comment, "I must understand La-Keeta interest (sic)." This is followed by a religious thought that a "CHRISTIAN" should not seek to attract undue attention.
The concluding item is one of July 21 in which the PLTF mentions that he is not working and so he concludes that last entry for 1988, some six months before the end of the year, with the following:
 "I must understand at this time she is the one working and bringing home the money. So I must adjust and make sure when she want something I must accommodate her, until I go back to work."
From my examination of the 1988 diary, I find nothing cruel therein nor again that the diary was being maintained as future evidence in a dissolution proceeding. With further reference to the Zoarski case, it appears to me that the following quotation from the trial referee's memorandum is pertinent and distinguishing:
 "Affirmatively, in support of her cross-complaint, she testified without a diary to a long list of cruel acts and abusive treatment by the plaintiff. Her testimony was clear and effective and unshaken by vigorous cross-examination."
This was not so in the instant proceeding. I found the DEFT was not clear and effective because I could not accept her testimony relating to the PLTF's treatment of her as credible. She did what she wanted regardless of his criticism.
The case of Garrison v. Garrison, 190 Conn. 173 (1983), is one in which the trial court granted the dissolution on the ground of intolerable cruelty and this issue is specifically treated in the Supreme Court's opinion on pages 178-181 wherein that Court sustained the trial court. The requirements to establish intolerable cruelty are found on pages 178-179 as follows:
 "`Intolerable cruelty has a subjective as well as an objective significance. There must not only be proof of acts of cruelty on the part of the defendant, but proof that in their cumulative effect upon the plaintiff they are intolerable in the sense of rendering the CT Page 9489 continuance of the marital relation unbearable by him [or her].' VanGuilder v. VanGuilder, 100 Conn. 1, 3, 122 A. 719 (1923)."
It is the conclusion of the undersigned that neither the subjective nor the objective requirements have been met by this DEFT. On page 179 of the Garrison case there is a recital of the cruel acts of the defendant-husband. Although there are similar matters referred to against the PLTF in this case, they have not been established. I find that the PLTF here was caring and concerned about his wife and children and not impatient and indifferent, and this is supported by this DEFT's own testimony. During this DEFT's illnesses, including hospitalizations, the PLTF took care of the home and the children. There is no significant unprovoked striking of the DEFT before the children. As to the issue of marital infidelity, the position of the parties in the instant case is the reverse of that in the Garrison case. Finally, by the DEFT's own testimony, the continuance of the marital relationship never became unbearable to her.
It is true that there was some criticism of the DEFT by the PLTF. I do not find it was intended for the sake of criticism alone and to be cruel or abusive. Early in their marriage they entered Jehovah's Witnesses. DEFT testified that, although she held to another religion, she trusted her husband's judgment and so followed him to the new religion for her. He was serious and applied himself to the tenets he had embraced and in time became an Elder. He was strict in his observance of the principles of the religion and he relied heavily on his reading of the Bible. I find that his criticisms of his wife relative to her hair cuts, her dress, her use of cosmetics as well as the colored contact lenses, were not to be cruel but rather an expression of his convictions as set forth in his diary entry of July 18, 1988, wherein he writes: "I must understand La-Keeta interest. I still say Christian Should not try to cause undue Attention to self."
I conclude that the DEFT, who has the burden of proof, has failed to establish intolerable cruelty by the PLTF as a ground for the dissolution of the marriage.
MARITAL INFIDELITY
The DEFT admitted her guilt. This, I find was the principal cause of the irretrievable breakdown of the marriage. The most serious violation was confirmed by the witness, Ernest Fischer. The DEFT admitted involvement with another person in Tennessee in 1974. She next admitted another involvement in 1987, and also with Mr. Fischer beginning in February 1989 and lasting for several months. During this period there were a number of nights when she did not return home and stayed over with Mr. Fischer. CT Page 9490 Mr. Fischer testified that the relationship terminated because she wished to get back to her husband and children. She disclosed this infidelity to her husband shortly after it was concluded in 1989. The parties had a long discussion after which the PLTF forgave the DEFT with the condition that a dissolution would be sought, if she were again unfaithful. It was not very long when, in August 1989, she had another encounter with the same Mr. Fischer and was again unfaithful.
Why did she have these love trysts with Mr. Fischer? After pausing and remaining in deep thought, in the witness box, for a truly long interval of time, she replied that the relationship at home was strained; that she was not being treated as a wife; that she was feeling insecure. Furthermore, that she had not planned this; that she had her needs and someone else could meet them. Finally, she stated that her actions were not for a sexual purpose. I did not accept her replies as being truthful.
A hearing was held by a tribunal of Elders of the Congregation of Jehovah's Witnesses to which the parties belonged. The decision was a disfellowship of the DEFT from the congregation. She could attend meetings as an observer with no right to participate. After a period of time she sought reinstatement which was denied.
While her infidelity is found to have been the major cause of the breakdown, there were other actions that contributed. These are simply enumerated for purposes of this memorandum as follows: her laziness in general in the areas of caring for the children, preparation of meals, caring for PLTF's clothes and cleanliness of the home; staying out after hours whether working or not, misuse of funds in that she either diverted funds from reimbursed expenses or failed to contribute to family needs, preferring her own needs first; as well as her consumption of alcohol, including the concealment of the same in defiance of her husband's wishes and to deceive him again. Her periods of depression were as a result of her own consciousness of guilt or betrayal and not as a result of the actions or doings of the PLTF. His name calling, directed at her, was of a minimal nature and not without some provocation on her part. There was no medical, professional or other evidence offered to refute this finding and conclusion.
In Venuti v. Venuti, 185 Conn. 156 (1981), our Supreme Court considered the questions of awarding alimony and counsel fees to an adulterous spouse. The Court noted on pages 157 and 158 that, under the dissolution statute, adultery is one of ten causes for granting a dissolution but a trial court may dissolve a marriage with irretrievable breakdown as the basis even though another cause is proven. Also that adultery is not listed as a factor in General Statutes 46b-62, 46b-82 to be considered in making an CT Page 9491 award unless it is one of causes of the dissolution; and further that, as a cause, it is only a factor to consider together with all the other factors enumerated in the General Statutes; and concluding on page 148 with the following:
 "Thus, there is no longer a foundation for the claim that as a matter of law it is an abuse of discretion to award alimony and counsel fees to an adulterous spouse."
In the Venuti case the trial court found that the adultery was not a cause of the breakdown.
However, in Robinson v. Robinson, 187 Conn. 70 (1982), the trial court did find that adultery was a cause of the irretrievable breakdown; also, that this conduct of the wife caused humiliation and mental anguish to the plaintiff. P. 71. The Supreme Court declared that because a dissolution action is essentially equitable in nature, a trial court, although required to consider the statutory criteria, could "consider any other factors which may be appropriate for a just and equitable resolution of the marital dispute." P. 72. Furthermore, in reply to the defendant's claim that the trial court had given inordinate weight to the cause of the breakdown, the following appears at page 72:
 "While alimony in whatever form, or an assignment of property is not to be considered either as a reward for virtue or as a punishment for wrongdoing, a spouse whose conduct has contributed substantially to the breakdown of the marriage should not expect to receive financial kudos for his or her misconduct."
STATUTORY CRITERIA
The PLTF is 41 years old. He is an iron worker employed by Union Local 424. He reports himself to be in good health. In addition to his wages, he has certain benefits which will be detailed later in this memorandum. He graduated from high school and continued his studies in college for one year and thereafter attended a computer programming school in Bridgeport. As members of Jehovah's Witnesses he and the children celebrate only one holiday and that is the day of the Lord's last supper.
The DEFT is 37 years old and has a physical disability and other health complaints. She graduated from high school and attended Stone Business College without receiving a diploma and has no shorthand skill. Her principal occupation has been working as a nurse's assistant at St. Raphael's Hospital. She has also CT Page 9492 handled private duty cases. At other times she has worked as a cocktail waitress in a local club with late evening into the early morning hours. The DEFT worked in the early years of the marriage during periods when the PLTF was unemployed. Most of her time during these early years was devoted to raising the children, caring for the home and the needs of the PLTF and the children. She testified that the PLTF always helped during her pregnancies and her stays in the hospital. He was also helpful during her periods of depression.
The DEFT testified to having spina bifida causing her backaches and pain at various times. She must constantly guard against bumping her back or being struck in her back because this will also result in numbness of her person and causing loss of power in her lower extremities. She cannot lift or carry heavy objects. She also testified to a congenital heart valve defect. This produces chest pains, requires short rest periods and sometimes bed rest for the day. The DEFT also testified that at the time of the hearing she was taking no medication for any of her ailments. Furthermore, she has not lost any time from work to go to the hospital emergency room for treatment either from her back or her heart problem. She has kept late hours of work.
The parties own two motor vehicles that are registered in both names. The PLTF has been driving the 1984 Plymouth Voyager which had a $600 loan balance due on June 25, 1991, and the DEFT has driven a 1988 Lincoln Continental which had a $7,000 loan balance. The PLTF has been paying the loan balances on both cars. This was not the original agreement of the parties. The DEFT was the one who pressed for the purchase of the Lincoln and who has been the operator of the car since its purchase and who agreed to make the payments on the loan balance. Very shortly after the purchase the DEFT refused to keep up the payments. The PLTF agreed to do so and it became a pendente lite order of this court on September 19, 1990.
Among the other assets of the parties which are joint or personal, the principal one is the house and lot at 58 Stevens Street, New Haven, which is owned jointly. The parties were living separately in the home after the divorce action was started in May of 1990. This latter arrangement did not work out well and the DEFT left the house on March 2, 1991. The PLTF has been residing in the house with the four children. The property was purchased from New Haven in 1982 at a cost of one ($1.00) dollar under an agreement to rehabilitate the property. In their financial affidavits of July 23, 1991, both are in agreement that the value of the property is approximately $140,000 and has mortgage balances of $82,000. It is true that the PLTF testified that the value might be less than $140,000 today. There had been an appraisal some four years prior to the hearing of this case in CT Page 9493 which the $140,000 figure had been set. The lower value would be attributed to the generally poor condition of the real estate market in Connecticut. Under the pendente lite orders of the court on September 19, 1990, and by agreement of the parties, the PLTF became obligated to pay the two mortgages as installments came due as well as the taxes, also the insurance premiums on the house and automobiles, and on himself, the DEFT and the children. His testimony was that he was keeping up most, if not all, of his obligations under the orders of the court.
The DEFT did not contribute a great deal financially to the financing and maintenance of the residential premises of the family. However, one cannot overlook the fact that these parties lived together as a family and worked together from February of 1972 to almost the end of 1990. The DEFT gave birth to four children in this union. During their years of infancy she was attentive to them and to her duties in the home. However, her efforts were truly only average or below in both of these general areas. This below average performance was especially so in the late years of the marriage when she put her needs and desires before everyone else in the family.
On the basis of the foregoing analysis, the DEFT is entitled equitably to a smaller distributive share of the family assets than the PLTF who has put forth much greater efforts and made more sacrifices for this family.
CUSTODY
Both parties agree on joint legal custody of the three children. The family relations officer and the children's attorney are in agreement that, with regards to physical custody, the three children should remain together. I agree and I believe it will be in the best interests of the children to remain together because they have established a close bond. Their lives have been happier staying together and have been more stable and secure in the presence of the PLTF. I am satisfied that so long as they remain in the present family home, the PLTF will continue to maintain the better environment for the continued growth and development of these children. The new lady tenants in the house are members of Jehovah's witnesses, have met the children and are in a position to help La-Ria when the PLTF is not available and have expressed their willingness to do so.
The PLTF has indicated that he has no objection to a granting of reasonable and liberal visitation to the DEFT so long as there is not undue interference with their time for school work and sleep.
MISCELLANEOUS CT Page 9494
Reference was made earlier in this memorandum to the pendente lite orders of the court of September, 1990. Another of those orders was for the PLTF to pay to the Temple Radiology Group the sum of approximately $872, which had previously been paid to the DEFT by her medical insurer. The PLTF has since paid this bill. He had cashed the earlier insurance check and applied the proceeds to the payment of the mortgages on the family dwelling.
In contrast thereto, the DEFT received two insurance checks totalling approximately $9300. These were reimbursement checks. However, the DEFT, by her own admission, did not apply the proceeds of the checks to pay for the medical services received. This is the only part of that testimony on her part on which I can attach any credibility. She may well have given her mother one-half of the proceeds but that was never justified and was of no help to this family. What she spent for the children and the household is too small to consider, if she did spend it in such manner. I find that she again placed herself first and spent much on clothes, jewelry, etc. She will have to call in her loan to her mother to meet her living expenses.
At one time the DEFT had medical and life insurance benefits at the hospital. She also was working 40 hours per week at $6.65 per hour. Effective February 26, 1989, she was reduced to 24 hours of work per week. She was thereafter on medical leave of absence from February 28, 1989 to April 3, 1989, which was extended to June 17, 1989. She was again on medical leave from May 1, 1990 to July 1, 1990. Her medical and life insurance coverages were cancelled as of February 1, 1991 (see Exh. I) or April 1, 1989 (see Exh. J).
The parties filed with the court financial affidavits dated July 23, 1991. The PLTF shows gross weekly wage income of $924. His deductions therefrom of $191.30 are for withholding, social security and Medicare. Now one must consider the impact of the new State income tax. The financial affidavit lists net weekly wages at $732. The financial affidavit does not list the monthly income of $500 for rental of the first floor of the family residence at 58 Stevens Street in New Haven. The weekly expenses are set forth at $901. Liabilities add up to $17,202.
The DEFT's financial affidavit reports weekly gross wages at $222 with $41 of deductions for withholding and social security. Added to her net weekly wage is $35 for temporary alimony, for a total net income of $216. Her weekly expenses are $297. She has liabilities of $19,556 which include $11,621 due Yale-New Haven Hospital for her stays, and for which she received in excess of $9,000 as reimbursement from her insurance company. CT Page 9495
Both financial affidavits list $25,000 for personal property of the home and their persons. There was no credible evidence to justify this figure. In savings they had $500. The DEFT shows $30,000 of term life insurance and the PLTF $200,000 of the same. In addition the PLTF testified that he is covered through his union with additional life insurance and that he does not pay the premium for this coverage.
The DEFT, as previously stated, has shown no pension or other retirement plan on her latest financial affidavit. The PLTF, on the other hand, lists on his affidavit a "Pension through Local 424 at age 62, $420.00 per month"; and an "Annuity through Local 424; Four year wait to vest." On examination of Exhibits 0 and 19 reveals the following and a finding is so made: The PLTF is enrolled in two plans. One is the "Iron Worker's Local No. 15 and 424 Pension Plan" (Pension Plan) in which, as of the hearing in this case, he was not vested. He had accumulated 5.80 credits and needed "at least 10 credits or complete 10 years of vesting service. . . ." The other plan is the "Iron Worker's Local No. 15 and 424 Annuity Plan" (Annuity Plan). The PLTF is 100% vested in the value of his account in the Annuity Plan. Exhibit 19, p. 2. In this Plan he was reported by the fund manager to have as of July 10, 1991 a total of $24,985.80. Exhibit 0. The PLTF does not contribute to either plan. Contributions are made by "Contributing Employers" under a collective bargaining agreement. Under the mechanics of the plans, the value of each employee's account is determined as of June 30 of each year when allocations I are made to each employee's account from the experience and operation of the year.
The court finds that the PLTF's interests in the Iron Worker's Locals No. 15 and 424 Annuity Plan and Pension Plan are marital assets subject to assignment pursuant to 46b-81 of the Connecticut General Statutes.
The DEFT places great emphasis on the fact that the marriage in this case endured for almost 20 years. The case of Crocker v. Crocker, 13 Conn. App. 129 (1987), is cited in support of the proposition that the duration of a marriage is of primary importance in determining the duration of alimony; and that the Appellate Court in the Crocker case found that an almost twenty year marriage to be of significance. It is true the Court repeated the reference to the length of the marriage in the concluding paragraph of the opinion. However, it also emphasized other factors favorable to the plaintiff wife in that case which are not present for the DEFT in the instant case.
In Valante v. Valante, 180 Conn. 528 (1980), at page 530, our Supreme Court writes: CT Page 9496
 "To begin with, our alimony statute does not recognize an absolute right to alimony."
Further on, the Court noted:
 ". . . no single criterion is preferred over all others." Id., 531. "In weighing the factors in a given case the court is not required to give equal weight to each of the specified items. Nevertheless, it is rather obvious that in making financial determinations the financial circumstances, both actual and potential, are entitled to great weight." Id., 531.
Further observation should be made on the question of alimony for the DEFT. In her brief she submits the following quotation from Rubin v. Rubin, 204 Conn. 224, 228 (1987):
 "The purpose of alimony is to meet ones' continuing duty to support; Wood v. Wood, 165 Conn. 777, 784 (1974);. . ."
An examination of the Wood case reveals the following as the full remarks of the Supreme Court at page 784:
 "Alimony is based upon the continuing duty of a divorced husband to support an abandoned wife and should be sufficient to provide her with the kind of living which she might have enjoyed but for the breach of the marriage contract by the defendant."
In the instant case the breach of the marriage contract was caused by the DEFT's conduct and she was not abandoned by her spouse in any manner.
In view of the foregoing, the following orders are entered:
1. A decree may enter dissolving the marriage on the ground of irretrievable breakdown.
2. Legal custody of the three minor children is awarded to the parties jointly with physical custody and residence with the PLTF father. The parties shall consult with one another on matters of health, education and welfare of the children. The PLTF shall have the final decision-making authority whenever a dispute arises between the parties regarding the children.
3. Reasonable and flexible rights of visitation are granted to the DEFT which, in part, shall specifically include the CT Page 9497 following:
a. Alternating Saturdays and Sundays, commencing November 9 and 10, 1991, from 10:00 A.M. until 7:00 P.M.
b. One night during the week from 5:00 P.M. to 8:00 P.M. to be mutually agreed upon by the parties.
c. Two weeks during the months of July and August, commencing in 1992, provided the DEFT shall give written notice to the PLTF not later than May 15th of each year of the weeks she selects. She may elect two consecutive weeks in either month or straddling the two months; or she may elect one week periods limited to each of the two months. Her election must be set forth in her notice. If she fails to give notice or to specify the particular periods, then the PLTF shall give written notice to the DEFT after May 15th and not later than June 15th, setting forth the two week period when the DEFT may have the children for summer vacation that year.
d. Either parent may take any of the children individually or together outside the State, provided notice of the place and time that will elapse are given in writing to the other; and provided further, there is no interference with the child's school attendance. The weekend visitations shall merge with the vacation weeks where they coincide.
e. The parties may enlarge the DEFT's visitation by mutual agreement. However, DEFT shall not enter the home at 57 Stevens Street, New Haven, for visitation.
4. The DEFT shall pay the sum of $1.00 per year to the PLTF for the support of each of the three minors.
5. The PLTF shall maintain through his employment his medical insurance coverage for the three minor children during their respective minorities. In the event such insurance shall not be available through his employment, he shall, nevertheless, make arrangements to provide CMS, Blue Cross, Mayor Medical or its equivalent, for said minors. He shall also be responsible for and pay all uninsured and unreimbursed medical and dental expenses for the children. These provisions shall be subject to Connecticut General Statutes 46b-84 (c).
6. The PLTF shall retain the DEFT on his medical insurance policy so long as such insurance is available through his present employment and for so long as the law permits. For a period of one year from the date of this order, the PLTF shall pay one-half the additional premium to cover the DEFT who shall also pay one-half such premium. Thereafter the DEFT shall pay the full CT Page 9498 premium, if she elects to continue in such insurance program. If the DEFT shall fail to pay her share of such premium, her coverage shall terminate unless the PLTF decides to pay for her. She shall at all times be solely responsible for and pay for uninsured and/or unreimbursed medical, dental, etc. expenses.
7. a. The Lincoln automobile is awarded to the DEFT and she shall be solely responsible for the loan balance on said car and all expenses from the ownership and operation of said car. She shall hold the PLTF harmless from any obligations, expenses and claims regarding said automobile and indemnify him for any such including reasonable counsel fees.
b. Likewise, the Plymouth Voyager is awarded to the PLTF and he shall in the same manner hold the DEFT harmless and indemnify her from any liability or damages respecting that automobile to include reasonable counsel fees.
The parties shall forthwith execute all necessary documents between themselves, the Connecticut Motor Vehicle Department, and insurance companies to carry out these orders.
8. a. The PLTF: is awarded exclusive possession of the home at 58 Stevens Street, New Haven, Connecticut, for the purpose of residing there with the three minor children.
Title to said property shall be held by the parties as tenants in common until the same is sold as hereinafter provided.
b. The court is of the opinion that fair and equitable distribution or division of the real estate, pursuant to provisions of Connecticut General Statutes 46b-81, is sixty-five (65%) percent to the PLTF and thirty-five (35%) to the DEFT of the net proceeds of the sale.
c. The premises are ordered sold and the net proceeds of the sale divided in the aforesaid percentages upon the happening of the earliest of the following: remarriage of the PLTF, cohabitation of the PLTF with an unrelated female pursuant to the statute, PLTF or children residing elsewhere, within 90 days after the 18th birthday of the youngest surviving child.
d. Until said sale, the PLTF shall pay the following: mortgages, principal and interest, property taxes, homeowner's insurance premiums, utilities, and all necessary repairs.
e. Net proceeds shall be calculated by subtracting from the gross selling price the following: mortgages, principal and interest and customary closing costs that are charged to the seller. The PLTF shall be solely responsible for the following CT Page 9499 items which shall be deducted from his share of the net proceeds and applied to the payment thereof at the closing: past due mortgage installments of principal and interest and penalties therefore; past due taxes, including interest penalties and lien fees; and unpaid utility bills. The DEFT shall have deducted from her share of the net proceeds the amount due the Yale-New Haven Hospital, which claim shall be paid at the closing. It is the order of this court that the DEFT shall be solely responsible for the debt owed the Yale University School of Medicine, Office of Professional Services, and shall save the PLTF harmless from any liability therefor; and further, shall indemnify him for any damages hereinafter incurred including reasonable attorney fees.
9. a. Any personal property taken from the residential home by the DEFT shall remain her sole property. She may also secure from the home any personal belongings still remaining such as clothes, cosmetics, jewelry, luggage, pictures, paintings and work tools or equipment. To obtain these she shall mail a list of the same to the PLTF directly or through her attorney. DEFT is not to enter the home to secure said property.
b. All the rest of the personal property within the residential premises shall be the sole property of the PLTF.
10. The PLTF shall pay in full all arrearages on the pendente lite alimony order of thirty-five ($35) dollars per week up to and including the payment for the week of November 11, 1991. Payment shall be completed on or before January 31, 1992.
11. The PLTF is ordered to complete the payment of five hundred ($500) dollars of legal fees to DEFT's counsel by earlier order of the court. Payment shall be made in full to the law firm of Resnik and Resnik, P.C., not later than April 1, 1992.
12. a. Counsel for the children has submitted a statement for services rendered in full of $2900. She acknowledges receipt of $300 on account. The sum of $2400 is approved as the reasonable balance to be paid by the parties to counsel.
b. Of said remaining balance, the PLTF shall pay $1500 in 15 equal monthly payments; and the DEFT shall pay $900 in twelve equal monthly payments. Payments by each party shall commence on January 15, 1992 and continue on the 15th day of each month thereafter until paid in full.
13. a. The PLTF shall pay to the DEFT as permanent periodic alimony the sum of sixty ($60) dollars per week. The pendente lite order of thirty-five ($35) dollars per week shall continue through the week of November 11, 1991. The permanent order shall commence with the week of November 18, 1991. The PLTF shall make CT Page 9500 the payments of alimony until the new wage withholding takes hold. It is ordered that a wage withholding order issue forthwith to provide for payment of permanent alimony.
b. This permanent periodic alimony order shall continue for a period of five years to the week of November 18, 1996, when it shall be reduced to forty-five ($45) dollars per week for an additional three years and then to terminate. This alimony order shall not be modifiable as to term but shall terminate sooner upon the happening of the first of the following: the death of either party, the remarriage of the DEFT or her cohabitation with a nonrelated male pursuant to statute.
14. The DEFT, La-Keeta Mason, is designated the Alternate Payee of Richard Mason's Annuity Plan (the Plan) only. The DEFT, as Alternate Payee, is ordered to be paid thirty-five (35%) percent of the sum in the Plan that has accrued as of December 31, 1991. Thereafter additional accruals to the Plan shall be the sole property of the PLTF. Payments to the DEFT shall be in equal monthly installments for a period of not less than two years to commence at the earliest date permitted under the Plan.
15. The PLTF shall retain as his sole property his interest in his Pension Plan. The DEFT shall receive no benefits from the Pension Plan.
16. a. The PLTF shall pay to the DEFT's attorney the sum of $2000 on account of counsel fees. This order is apart from the payment order in paragraph 10, supra. This sum shall be paid in 16 equal monthly payments of $125, commencing January 15, 1992.
b. In addition, PLTF shall pay his own counsel fees.
17. The DEFT lists a $30,000 life insurance policy on her financial affidavit of July 23, 1991. She is ordered to continue said policy designating the three minor children as irrevocable beneficiaries until the youngest reaches her eighteenth birthday.
18. a. The PLTF has two insurance policies. One is for $200,000 wherein the children are designated as beneficiaries. He is ordered to retain the three minor children as irrevocable beneficiaries on said policy of insurance until the youngest reaches her eighteenth birthday.
b. The PLTF also testified to being covered by life insurance through his union and that the DEFT was named as beneficiary. He is ordered to continue the DEFT as a beneficiary on said policy as long as the permanent periodic alimony order, eight years, and only as long as available through his present employment. CT Page 9501
19. Except as otherwise herein ordered, each party shall be responsible for and pay the liabilities on their respective financial affidavits dated July 23, 1991 as appears on file and also any other liabilities incurred since that date by each and shall hold the other harmless therefrom and indemnify for any damages incurred therefrom including reasonable attorney fees.
Counsel for the parties are requested to collaborate in the preparation of the appropriate QDRO and judgment file to be submitted to the undersigned for signature.
John Ottaviano, Jr. J State Trial Referee